[Cite as *State v. McKee*, 2019-Ohio-4307.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO.  8-19-16

      v.

CHASSITY L. MCKEE,                  O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Logan County Common Pleas Court
Trial Court No. CR 18 09 0271

**Judgment Affirmed**

**Date of Decision:   October 21, 2019**

APPEARANCES:

    *Sean P. Martin* for Appellant

    *Alice Robinson-Bond* for Appellee

**SHAW, J.**

{¶1} Defendant-appellant, Chassity L. McKee ("McKee"), appeals the March 5, 2019 judgment entry of conviction and sentence issued by the Logan County Court of Common Pleas journalizing her conviction by a jury on three counts of Theft, four counts of Identity Fraud, one count of Grand Theft, and one count of Theft from a person in a protected class. The trial court imposed upon McKee an aggregate prison term of fourteen years. On appeal, McKee claims that one of her Theft convictions and her conviction for Theft from a person in a protected class are supported by insufficient evidence and are against the manifest weight of the evidence. She also maintains that she received ineffective assistance from her trial counsel during the questioning of a State's witness.

*Procedural History*

{¶2} On September 11, 2018, the Logan County Grand Jury returned an eighteen-count indictment against McKee, which was later amended to a nine-count indictment, charging McKee with: Count One: Theft, in violation of R.C. 2913.02(A)(1), 2913.02(B)(2), a felony of the fifth degree; Count Two: Grand Theft, in violation of R.C. 2913.02(A)(1), 2913.02(B)(2), a felony of the fourth degree; Count Three: Theft, in violation of R.C. 2913.02(A)(1), 2913.02(B)(2), a felony of the fifth degree; Count Four: Identity Fraud, in violation of R.C. 2913.49(B)(1), 2913.49(I)(2), a felony of the fifth degree; Count Five: Identity

Fraud, in violation of 2913.49(B)(1), 2913.49(I)(2), a felony of the fifth degree; Count Six: Identity Fraud, in violation of R.C. 2913.49(B)(1), 2913.49(I)(2), a felony of the fifth degree; Count Seven: Theft, in violation of R.C. 2913.02(A)(1), 2913.02(B)(2), a felony of the fifth degree; Count Eight: Identity Fraud, in violation of R.C. 2913.49(B)(1), 2913.49(I)(2), a felony of the fifth degree; and Count Nine: Theft from a person in a protected class in violation of R.C. 2913.02(A)(2), 2913.02(B)(3), a felony of the second degree.

**{¶3}** The charges stemmed from an investigation conducted by the Logan County Sheriff's Office into allegations made by McKee's former fiancé claiming that McKee had stolen money from his accounts, sold personal property without his permission, and opened loans and credit cards in his name while he was receiving inpatient dialysis treatments in hospitals and rehabilitation centers causing him to live away from his home for most of 2017.  In a parallel investigation conducted by the Bellefontaine Police Department, a court-appointed guardian for an incompetent elderly person alleged that McKee had withdrawn a substantial amount of money from the ward's credit union account without authorization or permission.   Upon being arraigned, McKee entered a plea of not guilty to the charges.

**{¶4}** On January 29 and 30, 2019, the trial court conducted a jury trial on all nine counts listed in the indictment.  Several witnesses testified for the State.

McKee testified on her own behalf.  After hearing the evidence, the jury found McKee guilty on all nine counts.

{¶5} On February 28, 2019, McKee appeared for sentencing.  The trial court imposed a prison term of nine months on Count One, Theft; fifteen months on Count Two, Grand Theft; nine months on Count Three, Theft; nine months on Count Four, Identity Fraud; fifteen months on Count Five, Identity Fraud; nine months on Count Six, Identity Fraud; nine months on Count Seven, Theft; nine months on Count Eight, Identity Fraud; and seven years on Count Nine, Theft from a person in a protected class.  The trial court made the necessary statutory findings to order the sentences to be served consecutively for a total aggregate prison term of fourteen years.

{¶6} McKee appealed the trial court's judgment entry of conviction and sentence, asserting the following assignments of error.

**ASSIGNMENT OF ERROR NO. 1**

**THE STATE OF OHIO FAILED TO PRODUCE LEGALLY SUFFICIENT EVIDENCE TO SUSTAIN CONVICTIONS FOR THEFT IN COUNT ONE AND THEFT IN COUNT NINE.**

**ASSIGNMENT OF ERROR NO. 2**

**APPELLANT'S CONVICTIONS OF THEFT IN COUNT ONE AND THEFT IN COUNT NINE FELL AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**ASSIGNMENT OF ERROR NO. 3**

**APPELLANT'S TRIAL COUNSEL COMMITTED INEFFECTIVE ASSISTANCE OF COUNSEL BY FAILING TO OBJECT TO TESTIMONY OF THE STATE OF OHIO'S INACCURATE AND CONTRADICTORY EVIDENCE DURING PRESENTATION OF THE EVIDENCE FOR COUNT NINE, AND THEN STIPULATED TO THE ADMISSIBILITY OF THAT INACCURATE AND CONTRADICTORY EVIDENCE.**

{¶7} For ease of discussion, we elect to discuss the first and second assignments of error together.

*First and Second Assignments of Error*

{¶8} In her first and second assignments of error, McKee argues that the jury's verdicts on Counts One and Nine are not supported by sufficient evidence and are against the manifest weight of the evidence.

*Standard of Review*

{¶9} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id*. When an appellate court reviews a record upon a sufficiency challenge, " 'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶10}** By contrast, in reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *Thompkins* at 387. In doing so, this Court must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id*.

**{¶11}** Nevertheless, a reviewing court must allow the trier of fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

1. *Count One: Theft of the ATV (Randall Austin)*

*Controlling Statute*

**{¶12}** In Count One, McKee was convicted of fifth degree felony Theft in violation of R.C. 2913.02(A)(1) which states that:

> **(A)  No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:**

     **(1)   Without the consent of the owner or person authorized to give consent.**

The statute specifies that: "[i]f the value of the property or services stolen is one thousand dollars or more and is less than seven thousand five hundred dollars * * * a violation of this section is theft, a felony of the fifth degree."  R.C. 2913.02(B)(2).  Thus, in order to elevate the level of the offense from a first degree misdemeanor to a fifth degree felony, the State must prove that the value of the property stolen is $1,000 or more and less than $7,500.

*Evidence Presented*

{¶13} The evidence established that Randall Austin, McKee's former fiancé, had authorized McKee to pay his mortgage and utility bills while he was receiving inpatient dialysis treatments at hospitals and rehabilitation facilities during the majority of 2017.  In December of 2017, Austin became suspicious about the state of his affairs and asked a friend, Rick Walters, to check on his house.  Walters arrived at Austin's home and discovered that the utilities had been disconnected for non-payment.  Walters also found a Sheriff's notice of foreclosure posted on the home.  After learning this news, Austin reviewed his bank accounts and realized that a substantial amount of money had been withdrawn.  He also learned that lines of credit had been opened in his name without his authorization, and that his mail had been forwarded to McKee's residential address.

{¶14} When Austin returned to his home he observed several items missing, including his 1996 Cadillac motor vehicle, the title to his Chevy Truck, mounted deer heads, and two gun cases. Austin became concerned about the items he had placed in a storage unit. He had also given McKee a key to the unit prior to receiving prolonged inpatient care. Upon arriving at the storage unit, Austin noticed that the lock had been changed because his key no longer worked. With his permission, law enforcement cut the lock to allow Austin to gain access to the unit. Austin recalled that the once full unit was half empty. He noticed several items were missing including an ATV, a snow blower, and tree stands for hunting deer. Austin testified that he had to file for Bankruptcy as a result of McKee's misconduct.

{¶15} For her part, McKee testified that Austin gave her permission to pay her bills from his bank account. She explained that Austin had agreed to pay her bills because of the amount of time she had spent caring for him and helping him get to his dialysis treatments, which were multiple times a week and prevented her from earning an income. She also claimed that Austin had intended to liquidate his assets so that they could travel once they were married, and that she had permission from Austin to sell the ATV and other items. She further denied fraudulently opening loans and lines of credit in Austin's name and insisted that Austin obtained the accounts on his own accord.

*Discussion*

**{¶16}** On appeal, McKee challenges her conviction for fifth degree felony theft on the basis that the prosecutor failed to present sufficient evidence establishing that the value of the ATV was at least one thousand dollars. At the outset we note that under R.C. 2913.61(D)(3), the value of personal property is determined by its "fair market value," as distinguished in the statute from "replacement value," which is the measure of value for heirlooms and collector's items, and for items that are used in the victim's profession, business, trade or occupation. R.C. 2913.61(D)(3).

**{¶17}** At trial, Austin testified that he valued the ATV at $2,000. Specifically, the testimony at trial was as follows:

> **Prosecutor: How much would you say that Honda four-wheeler was valued at?**
>
> **Austin: I would say $2,000 was what I could get for it.**

(Tr. at 168).

**{¶18}** McKee directs our attention to the testimony of the purchaser of the ATV, Donald Mantz, who testified to buying the ATV from McKee at the storage unit. Mantz testified that he responded to an online ad listing the Honda ATV for sale. The text messages between him and the seller were admitted as an exhibit at trial. Evidence produced at trial indicated that the phone number in the text messages belonged to McKee. He recalled that on April 4, 2017, he traveled to a

storage unit in East Liberty, Logan County, Ohio. There, he meet an "older lady," "kind of a younger lady," and "a young guy." (Tr. at 214). He described the condition of the ATV as being "in pretty bad shape. The wheels were frozen, the brakes were bad, didn't start. The battery, nothing." (Id). He explained that the "young guy" had to help him get it into his truck because "it was frozen." (Id).

{¶19} McKee asserts that Mantz' testimony regarding the poor condition of the ATV at the time he bought it negates Austin's testimony valuing the ATV at $2,000. She also claims that Austin's testimony is unreliable because he had not seen the ATV immediately prior to the sale and therefore could not have known the condition of the ATV at the time of the sale.

{¶20} We recognize that there are cases, such as the two cited to by McKee in her brief, demonstrating instances in which a court did not find the victim's testimony regarding the fair market value of a stolen item to be sufficient.[1] However, we find the salient facts in those cases which supported the court's rationale are not present in the case *sub judice*.

---

[1] *See State v. Griffin*, 1st Dist. Hamilton No. C-080392, 2009-Ohio-2482, (finding the victim's testimony that he purchased the GPS device for $800 several months before the theft and a recent advertisement for a new unit of the same model listed for $598.27 was insufficient to establish what a willing buyer would have paid a willing seller for a used GPS device of that model. The court found that in light of evidence that the particular model was rapidly depreciating in value, a trier of fact could not have reasonably inferred that a used model would have retained a value of at least $500 in order to elevate the offense to a fifth degree felony); *State v. Reese*, 165 Ohio App.3d 21, 2005-Ohio-7075 (7th Dist.)(finding that the victim's testimony regarding the value of a stolen ring was insufficient because it was based upon what the victim's mother had told her before she died and therefore constituted hearsay. Moreover, the court found that the victim's listing in a printed ad offering to sell the ring was also hearsay and not sufficient.)

**{¶21}** Rather, a review of the applicable case law reveals that Ohio courts have consistently held that a victim's testimony can be sufficient to prove the value of the stolen property. *See e.g.*, *State v. Green*, 3d Dist. Union No. 14-2000-26, 2001-Ohio-2197, *3 (finding the victim's testimony that the damage to her home exceeded five hundred dollars and the value of the items stolen exceeded six hundred dollars provided a firm basis for the trial court's decision to overrule the defendant's Crim.R. 29(A) motion); *State v. Bartolomeo*, 10th Dist. Franklin No. 08AP-969, 2009-Ohio-3086, ¶ 25 (holding the victim's testimony was sufficient to prove the value of stolen property for purposes of the theft charge); *State v. Noble*, 12th Dist. Warren No. CA2014-06-080, 2015-Ohio-652, ¶ 22 (finding the victim's testimony regarding the value of property stolen was sufficient to elevate the theft offense to a fifth-degree felony).

**{¶22}** Here, we find Austin's testimony valuing the ATV at $2,000 is probative of its fair market value under R.C. 2913.61(D)(3). Therefore, we conclude that Austin's testimony, if believed, is sufficient to support a finding by the jury that the value of the stolen ATV was at least $1,000, thereby elevating the theft offense to a fifth-degree felony.

**{¶23}** McKee also argues that her conviction in Count One is against the manifest weight of the evidence. In support of this claim, she asserts an argument substantially similar to the one she made regarding sufficiency of the evidence.

McKee maintains that her conviction is against the manifest weight of the evidence because "Austin and Mantz have differing views of the worth of the ATV." (Appt. Br. at 12). However, the record simply does not support this argument. While Mantz did describe the ATV to be in poor condition, nothing in his testimony is inconsistent with Austin's valuation of the ATV at $2,000. Moreover, the jury was asked to specifically find the value of the stolen property in the verdict form. The jury was given the choice of "(1) 'less than $1000;' or (2) '$1,000 or more and less than $7,500.' " (Doc. No. 70). The jury specifically determined that the value of the ATV was "$1,000 or more and less than $7,500" and wrote that phrase in the space provided on the verdict form. (Id.)

{¶24} With Austin's testimony being the only evidence in the record of the value of the ATV without any apparent contradiction and the jury's specific determination of the value in the verdict form, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[2] Accordingly, we conclude that McKee's

---

[2] We note that the State admitted as an exhibit a piece of lined notebook paper found in McKee's vehicle during the execution of a search warrant. On this paper was a handwritten note stating "I Randy Austin sold 1994 Honda 300 Fortax and Snow Blower for $960.00 on April 5, 2017 to Don Mantz [address and phone number]. All items were sold as is!!!" (State's Ex. No. 145). Despite the fact that this exhibit appears to be a receipt or bill of sale for a Honda ATV, there was no testimony at trial establishing the origin of this paper or its significance. The only testimony relating to the exhibit came from the law enforcement officer who explained that it, along with several other personal items related to the two victims in this case, were found in McKee's vehicle during the search.

conviction for Theft in Count One is supported by sufficient evidence and is not against the manifest weight of the evidence.

*2. Count Nine: Theft from a Person in a Protected Class (Zdzislaw Mikulski)*

*Controlling Statute*

**{¶25}** In Count, Nine McKee was convicted of Theft in violation of R.C. 2913.02(A)(1) which states that:

> **(A)   No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:**
>
> **(1)   Without the consent of the owner or person authorized to give consent.**

The statute specifies that: "if the victim of the offense is an elderly person, disabled adult, active duty service member, or spouse of an active duty service member, a violation of this section is theft from a person in a protected class * * * If the value of the property or services stolen is thirty-seven thousand five hundred dollars or more and is less than one hundred fifty thousand dollars, theft from a person in a protected class is a felony of the second degree." R.C. 2913.02(B)(3).

**{¶26}** Thus, in order to elevate the level of the offense from a first degree misdemeanor to a second degree felony, the State must prove that McKee committed the theft offense against a person in a protected class, and that the value of the property stolen was $37,500 or more and less than $150,000.

*Evidence Presented*

{¶27} Lori Morris, a social worker at Belle Springs, formerly Heartland of Bellefontaine (hereinafter referred to as "Heartland"), testified that she met McKee when Austin was admitted to the facility. She recalled that Austin referred to McKee as his wife. She explained that she and other staff members found this strange because McKee also referred to herself as the wife of another resident, Zdzislaw Mikulski ("Ziz"), who incidentally was admitted to the facility the same day as Austin on October 20, 2017. Ms. Morris later discovered that McKee was not married to either man.

{¶28} Ms. Morris recalled that McKee claimed to have been "taking care" of Ziz in his home prior to him being admitted to Heartland. She described Ziz as in his eighties and as having some cognitive issues, which led to him to being easily confused and unable to hold a conversation or make decisions for himself. Ziz had a daughter who lived in Nevada and a son who lived in Ziz's native Poland.[3] Ms. Morris recalled that McKee became aggressive with her when she sought information about Ziz. Ms. Morris and other staff members became suspicious of McKee's relationship with Ziz. Eventually, Ms. Morris reached the conclusion that a guardian should be court-appointed to manage Ziz's finances and paperwork was filed on Ziz's behalf by the appropriate Heartland personnel.

---

[3] The evidence indicates that after World War II Ziz had a career with the Federal Government in the State Department and was fluent in several languages.

**{¶29}** Connor Kinsey, a local attorney, testified that he was contacted by the Logan County Family Court to potentially be appointed a guardian for Ziz. He recalled that a hearing took place in the Probate Division of that court on November 22, 2017, during which Ziz was found incompetent based upon his inability to demonstrate a fundamental understanding of the proceeding, his very limited ability to communicate—despite a Polish interpreter being present—and severe hearing loss. Mr. Kinsey recalled that in addition to the conclusions drawn in a medical evaluation supporting the court's incompetency determination, "[i]t was plain as day that Mr. Mikulski had no idea what was going on, the lack of capacity to make any sort of informed decision on his own behalf, that it was—this guy needed help." (Doc. No. 111 at 320; State's Ex. 13). Mr. Kinsey further explained that Ziz had a very strained relationship with his daughter, and that his son was not able to be contacted. As a result of no suitable relative being available, the probate court appointed Mr. Kinsey as Ziz's guardian. Notably, McKee was present at the competency hearing, asserting that Ziz was competent and did not need a guardian. Incidentally, when the probate court asked McKee about Ziz's finances she claimed to have no knowledge of them.

**{¶30}** Mr. Kinsey recalled going to Ziz's home to attempt to find personal information and financial records in order to assess Ziz's ability to afford the expensive long-term care at Heartland and his eligibility for Medicaid. He recalled

that finding this information was a "real puzzle to solve." (Doc. No. 111 at 327).

Mr. Kinsey described Ziz "as an extreme example of a hoarder;" that Ziz's house

"looked like a home that had not been touched or cleaned or anything probably in

the last 70 years." (Id. at 328). Despite this fact, Mr. Kinsey could not locate any

mail or other correspondence related to banking.[4] Due to the lack of information

and access to Ziz's financial records, Mr. Kinsey explained that it took over three

months to locate his financial accounts and have them frozen. Once he was able to

gain access to the accounts in early January 2018, he noticed that a significant

amount of money had been withdrawn from Ziz's credit union account using ATMs,

at a rate of $700 daily, since Ziz had entered Heartland in October 2017. Thereafter,

Mr. Kinsey alerted law enforcement.

{¶31} Detective Dwight Salyer of the Bellefontaine Police Department

recalled that his investigation into the fraudulent conduct on Ziz's credit union

account was initiated by a report filed by Mr. Kinsey. He testified that at the time

of the hearing Ziz was 89 years old. Using the statements from Ziz's credit union,

Det. Salyer was able to trace the dates and locations of when and where Ziz's debit

card was used. Det. Salyer obtained nearly a hundred still photos of McKee using

Ziz's card at various ATMs from the financial institutions noted on Ziz's credit

---

[4] During the search of McKee's vehicle several personal items belonging to Ziz and his deceased wife were found including their social security cards, bank statements, Ziz's checkbook, deeds to land, and life insurance paperwork.

union statements. Det. Salyer observed that the ATM withdrawals from Ziz's account increased in August of 2017 and continued to escalate in frequency and in amount through December of 2017. Many of these ATM transactions occurred at the same locations near McKee's residence in Bellefontaine and the Hollywood Casino in Columbus. Det. Salyer contacted the Hollywood Casino and learned from McKee's player account that she had made 175 trips to the casino in the year 2017, and that her visits significantly increased in the latter part of 2017. Det. Salyer stated that the casino records indicated that McKee had a total loss of approximately $42,000 for the year 2017.

{¶32} The information in these casino records were confirmed and further elaborated upon by Lynn Mackin, an Inventory Compliance Officer at the Hollywood Casino. Ms. Mackin explained that McKee was a member of the casino and her activity could be tracked through her player card. The casino records also indicated that McKee was primarily a slot player. Ms. Mackin stated that there was a significant increase in McKee's visits to the casino in October, November, and December of 2017. Ms. Mackin testified that in December 2017 alone McKee's loss was $17,569, which was over forty percent of her entire loss for the year 2017 of $42,291.

{¶33} Through his investigation, Det. Salyer was able to establish that McKee had withdrawn $43,389.25 from Ziz's credit union account from October

20, 2017 to January 11, 2018. Det. Salyer explained that this number did not include ATM fees and point of sale transactions. According to Det. Salyer's calculations, the total funds stolen from Ziz's credit union account with the point of sale transactions was $45,147.59.

{¶34} McKee testified on her own behalf. She explained that she met Ziz through her mother who delivered "Meals on Wheels" to his home. McKee stated that she helped take care of Ziz when no one else would. She claimed that she withdrew the money from Ziz's credit union account upon his request. She maintained that Ziz did not trust anyone and asked her to withdraw the money and bring it to his room at Heartland. Notably, McKee's testimony was contradicted by other testimony at trial indicating that no money was ever found in Ziz's room at Heartland. Moreover, the record further established that once Ziz was declared incompetent in November 2017, McKee was prohibited from visiting Ziz at Heartland. McKee further admitted to making frequent visits to the Hollywood Casino, but maintained that she only gambled with her own money that she received from tax refunds, previous jackpot winnings, and "comps" on her player card.

*Discussion*

{¶35} On appeal, McKee contends that the State failed to present sufficient evidence to support her conviction for second degree felony Theft from a person in a protected class. She further maintains that her conviction is against the manifest

weight of the evidence. In making this argument, McKee focuses solely upon the testimony from Lynn Mackin, the representative from Hollywood Casino who testified to the information obtained from McKee's player card. McKee maintains that Ms. Mackin's testimony regarding the casino records was an inaccurate representation of the money McKee spent at the casino. McKee further appears to argue that Ms. Mackin's testimony and the admission of the casino records as an exhibit only served to confuse and bias the jury by attempting to establish that McKee "was using the victim's ATM card to withdraw money on a continual basis at the Hollywood Casino in Columbus and then gambling the victim's money away." (Appt. Br. at 10, 13).

{¶36} At the outset, we note that Ms. Mackin's testimony was clear regarding the accuracy of the figures in the casino player records. Specifically, Ms. Makin explained that one of the figures reflected in the records was the "coin in" number, which is the money "played" all day by a particular player. She described how the figure is calculated. "If you were to put a dollar into a machine and you just kept spinning and you would win a hand, win again or lose the same money and you spun again without ever cashing out, the money would just get recycled." (Doc. No. 111 at 468). Ms. Mackin testified that the "coin in" number also reflected that McKee's activity at the casino had increased from September 2017, when the casino records indicate that McKee "played" approximately $6,000, compared to

December 2017, when McKee "played" over $414,000. However, Ms. Mackin testified that, unlike the "coin in" figure, the loss figure stated on the casino records is a "true number," not a "recycled number," and that McKee's loss for the year 2017 was $42,291." (Id. at 472).

{¶37} On appeal, McKee claims that the casino records failed to provide accurate numbers to prove the amount stolen from Ziz's account. By focusing only on Ms. Mackin's testimony, McKee overlooks the testimony of Detective Salyer who provided a detailed narrative of his investigation and nearly one hundred still photos that place McKee at the ATMs identified on Ziz's credit union statement that were used to withdraw $43,389.25 from October 2017, when Ziz was admitted as a long-term care patient at Heartland, to January 2018, when the court-appointed guardian was able to freeze the account. Thus, even without the brief testimony of Ms. Mackin, the record demonstrates that there was sufficient evidence presented by the State to prove that McKee knowingly exerted control over Ziz's credit union account without his consent, with purpose to deprive him of funds in the amount of $37,500 or more and less than $150,000. The record also unequivocally demonstrates that Ziz was over the age of 65 and was deemed incompetent thereby establishing that he is a person in a protected class. Accordingly, we find that McKee's conviction on Count Nine is based upon sufficient evidence.

{¶38} McKee also maintains that her conviction is against the manifest weight of the evidence. Again, she makes an argument solely upon the testimony of Ms. Mackin and appears to contend that the discussion and admission of the casino records showing a "coin in" number for the days McKee visited the casino was confusing to the jury and created bias against her. As previously discussed, Ms. Mackin's testimony was clear that the "coin in" number in the reports was a "recycled number" and not indicative of the true amount of money McKee put into the slots. The other information contained in the casino records served to establish the increased frequency of McKee's visits to the casino after Ziz entered Heartland and that nearly half of McKee's total loss for 2017 occurred in December of 2017. Notwithstanding the fact that the bank records along with the photos obtained from Det. Salyer's investigation established that one of the ATMs McKee habitually frequented to withdraw money from Ziz's account was at the Hollywood Casino, a rational juror could determine McKee's testimony regarding the source of her gambling funds was not credible, and thus could reasonably infer that McKee used some of the funds that she withdrew from Ziz's account at the casino. Accordingly, we find no merit to the contention that McKee's conviction is against the manifest weight of the evidence.

{¶39} Based on the foregoing discussion, we find that McKee's convictions on Counts One and Nine are supported by sufficient evidence and are not against

the manifest weight of the evidence. On this basis, the first and second assignments of error are overruled.

*Third Assignment of Error*

**{¶40}** In her third assignment of error, McKee argues that her trial counsel was ineffective for failing to object to testimony provided by Ms. Mackin regarding the casino records and for further stipulating to the admission of the casino records as an exhibit. McKee's arguments in this respect are premised upon the same criticisms of the casino records that she previously asserted in the second assignment of error.

**{¶41}** To prove an allegation of ineffective assistance of counsel, McKee must satisfy a two-prong test. First, McKee must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. Second, McKee must demonstrate that she was prejudiced by counsel's performance. *Id*. To show that she has been prejudiced by counsel's deficient performance, McKee must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley*, 42 Ohio St.3d at paragraph three of the syllabus.

**{¶42}** In the second assignment of error, we addressed McKee's characterization of the casino reports and discussed that the record demonstrates

there was little confusion at trial regarding how the numbers derived from McKee's player card were calculated and their significance to the case. Moreover, there was additional testimony from other witnesses, bank statements, and surveillance photos establishing each and every element of the Theft offense without the casino records and Ms. Mackin's testimony. Nevertheless, on cross-examination McKee's trial counsel effectively clarified the "recycled numbers" imbedded in the "coin in" numbers to cast doubt on the reliability of those figures. Accordingly, the record simply does not support McKee's claim that her trial counsel was ineffective on this basis. As such, we overrule the third assignment of error.

{¶43} For all these reasons, the assignments of error are overruled and the judgment and sentence of the trial court is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**